# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

JAMARR R. STONE,                    :

                    Petitioner,        :

        Case No. 3:08CV00364

 vs.                                 :

        District Judge Walter Herbert Rice

WARDEN, LEBANON              :    Magistrate Judge Sharon L. Ovington
CORRECTIONAL  INSTITUTION,

                         :

               Respondent.        :

---

## REPORT and RECOMMENDATIONS[1]

---

This matter is before the Court upon *pro se* Petitioner's petition for writ of

habeas corpus (Doc. #1) and redacted memorandum in support thereof (Doc. #6);

Respondent's answer/return of writ (Doc. #7); Petitioner's traverse (Doc. #8); a

transcript of the state court proceedings (Doc. #9); and the record as a whole.

I.      **FACTUAL AND PROCEDURAL BACKGROUND/THE PARTIES'
        CLAIMS**

---

[1]Attached hereto is a Notice to the parties regarding objections to this Report and
Recommendations.

In January 2005, a grand jury in Clark County, Ohio indicted Petitioner Stone on one count of murder with a firearm specification, in violation of Ohio Rev. Code § 2903.02(A), and one count of tampering with evidence, in violation of Ohio Rev. Code § 2921.12, in connection with the shooting death of William G. Evans, Jr. (*See* Doc. #7, Exh. 1). Stone entered an initial plea of not guilty.

On June 22, 2004, appearing with counsel, Stone withdrew his not guilty plea and entered a negotiated plea of guilty to one count of murder, with the State moving to dismiss the firearm specification and the tampering with evidence count. (Doc. #7, Exh. 2; Doc. #9, pp. 3, 11-12). The plea colloquy included the following exchange with the trial judge, in pertinent part:

> * * *
>
> THE COURT: Have you discussed this case and your possible defenses with your attorney?
>
> DEFENDANT: Yes.
>
> THE COURT: Are you satisfied with the advice and representation that your attorney has given you?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: Have you understood everything that's been placed on record this afternoon?
>
> DEFENDANT: Yes, sir.

> THE COURT: Has anyone made any promises to you
> other than what's been placed on record to get you to
> enter this plea?
>
> DEFENDANT: No, sir.
>
> THE COURT: Has anyone made any threat to you to get
> you to enter this plea?
>
> DEFENDANT: No, sir.
>
> * * *

(Doc. #9, pp. 6-7).  The trial court then accepted Stone's guilty plea.  (*Id.*, p. 12).

Before sentencing and after a statement by the victim's mother, Stone's

counsel offered the following statement, in pertinent part, on the record:

> MR. KAVANAGH: . . . Your Honor, I feel compelled to
> speak on Mr. Stone's behalf. . .
>
> I want the Court to know and the family to know that
> Jamarr can't take back what he did.  He has always
> expressed remorse to me; and if you can be manly in
> this situation, he has.  He's turned himself in from the
> beginning.  He has wanted to 'fess [sic] up to what he
> did, and he's done that here today.  It's his initiative that
> he contacted me and asked there not be a trial in this
> case and he would plead to this charge and that he be
> sentenced to 15 to life . . .

(*Id.*, p. 15).  Petitioner himself then stated as follows:

> DEFENDANT: . . .  I want to say that words can't
> express the situation that happened, and I'm sorry for
> acting in a rage and taking your son's life . . .  I just want

3

> to say I'm sorry and I wish that we could rewind time
> and neither one of us were at that bar that night . . .

(*Id.*, p. 16).

The trial court thereafter imposed a term of fifteen actual years to life imprisonment.  (Doc. #7, Exh. 3; Doc. #9, pp. 17-18).  Stone did not pursue a direct appeal from that conviction and sentence.

On November 29, 2004, Stone filed a *pro se* motion in the Clark County Court of Common Pleas to withdraw his guilty plea, or alternatively, a "petition to set aside judgment and conviction."  (Doc. #7, Exh. 4).  That document set forth a single claim for relief:

> PETITIONER W[A]S DENIED EFFECTIVE
> ASSISTANCE OF COUNSEL AS GUARANTEED BY
> SECTION 10, ARTICLE I, OF THE OHIO
> CONSTITUTION AND THE FIFTH, SIXTH AND
> FOURTEENTH AMENDMENTS TO THE UNITED
> STATES CONSTITUTION.

(*Id.*, Exh. 4, p. 4).  On May 19, 2005, Stone filed a second motion to withdraw his guilty plea, this time setting out 16 claims for relief, all alleging ineffective assistance of counsel.  (Doc. #7, Exh. 6).  By order entered March 8, 2006, the trial judge denied Stone's request to withdraw his plea and dismissed his petition for post-conviction relief.  (*Id.*, Exh. 7).

Stone timely appealed that decision to the Ohio Court of Appeals for the

Second Appellate District. (*Id.*, Exh. 8). Stone's *pro se* appellate brief set forth

four assignments of error, as follows:

> (1) The trial court erred as a matter of law in denying relief without a hearing when the files and records of the case did not demonstrate that [Stone] was not entitled to relief and where the 180 day period in which the trial court was permitted to dismiss the petition without a hearing had expired, depriving the court of jurisdiction to deny relief without a hearing, depriving [Stone] of due process and equal protection of the law as guaranteed by the state and federal constitutions.

> (2) The trial court erred as a matter of law in failing to make and file findings of fact and conclusions of law as to each of [Stone's] claims set forth in the post-conviction petition and withdrawal motions, and in dismissing the claims without a hearing, depriving [Stone] of due process and equal protection of the law.

> (3) [Stone's] guilty plea was not made with the effective assistance of counsel, rendering the results of the plea constitutionally infirm, and the trial court's failure to grant relief was prejudicial error.

> (4) The withholding of material exculpatory evidence by the prosecutor contributed to the unconstitutional guilty plea and deprived [Stone] of due process of law, and the trial court's failure to grant relief, or even to address the issue, is prejudicial error.

(*Id.*, Exh. 9, p. iv). On February 26, 2007, the state appellate court entered an

opinion affirming the trial court's judgment. (*Id.*, Exh. 12).

On March 12, 2007, Stone filed a *pro se* appeal to the Ohio Supreme Court

from the appellate court's decision. (*Id.*, Exh. 13). His brief to the Supreme Court

raised five grounds for relief, as follow:

> (1) Where a court of appeals erroneously deems
> properly presented Assignments of Error as moot and
> fails to pass upon them, the appellant is denied due
> process and equal protection with regard to available
> appellate remedies.
>
> (2) Where a timely petition for post-conviction relief in
> a criminal case sets forth substantive grounds for relief,
> and the trial court does not conduct a hearing, or issue
> findings of fact and conclusions of law within the
> mandatory 180 day period set forth in [Ohio] Criminal
> Rule 35(C), the trial court is required to conduct a
> hearing and the failure to do so is a violation of due
> process of law.
>
> (3) Where a timely petition for post-conviction relief in
> a criminal case sets forth several grounds for relief
> which are supported by competent and credible
> evidence dehors the record, the trial court errs as a
> matter of law in failing to address each of the grounds
> for relief in its findings of fact and conclusions of law
> denying relief, depriving the petitioner of due process
> and equal protection of law in accessing state-created
> corrective remedies.
>
> (4) Where a guilty plea in a criminal case is induced by
> ineffective counsel, and the defendant established that,
> but for counsel's ineffectiveness, he would have insisted
> on a trial, the plea is constitutionally infirm and refusal
> to permit withdrawal of the plea or to grant post[-
> ]conviction relief vacating the judgment of conviction
> denies due process and equal protection of the law.

> (5) Where a prosecutor in a criminal case withholds
> material and exculpatory evidence, due process of law
> is violated and where the proof of such a violation is
> presented to a trial court in a petition for post-
> conviction relief, the trial court also violates due process
> of law in failing to even address the claim or examine
> the evidence supporting the issue.

(*Id.*, Exh. 14). The Ohio Supreme Court's June 20, 2007 entry on Stone's case read

as follows, in its entirety:

> Upon consideration of the jurisdictional memoranda
> filed in this case, the Court denies leave to appeal and
> dismisses the appeal as not involving any substantial
> constitutional question.

(*Id.*, Exh. 15).

Stone's *pro se* petition for writ of habeas corpus in this Court followed,

setting forth two grounds for relief:

> GROUND ONE:  Petitioner was deprived of effective
> counsel.
>
> Supporting facts:  During the pre-trial process, trial
> counsel refused to interview exculpatory witnesses,
> failed to maintain any meaningful attorney-client
> communication, lied to Petitioner about the allotment of
> funds for an investigator by the trial court, lied to
> Petitioner about the prosecutor allegedly threatening to
> bring another murder charge, and refused to conduct
> any investigations, resulting in the compelled guilty
> plea.

GROUND TWO:  Petitioner was denied due process by the withholding of exculpatory evidence by the prosecutor.

Supporting facts:  The prosecution withheld exculpatory evidence that demonstrated the actual innocence of Petitioner, including the surveillance tapes from the location at which the homicide occurred that prove the decedent was the aggressor, the criminal records of the majority of the state's witnesses as well as the extensive violent criminal history of the decedent, the toxicology reports of the decedent demonstrating [a blood alcohol content] of .22 [percent], and the evidence that the dece[d]ent had a shiny cell phone in his hand, exactly as asserted by Petitioner (which he thought was a gun) but which the state denied that he had anything.

(Doc. #1, pp. 6, 7).

With respect to Petitioner's ineffective assistance of counsel claim, Respondent's return of writ asserts that Stone cannot demonstrate facts sufficient to overcome the presumption that his guilty plea was knowing and voluntary, and that any constitutional claim was waived thereby.  (Doc. #7, pp. 1-12).  In addition, Respondent urges that Stone has not shown that his trial counsel's performance was deficient, or that Stone was prejudiced by any alleged error.  (*Id.*, pp. 13-14).  As to Petitioner's allegations that the prosecution withheld evidence, Respondent maintains that claim is doomed by Stone's failure to demonstrate either that the prosecutor in fact withheld any evidence or that the

evidence he cites would have exculpated him. (*Id.*, pp. 12- 13). Respondent thus

moves to dismiss Stone's petition without the necessity of a hearing. (*Id.*, p. 15).

In his traverse, Petitioner urges that his "talisma[ni]c incantation . . . during

the plea colloquy" does not negate either his trial counsel's alleged failure to

investigate viable leads or counsel's alleged lies intended to induce Petitioner to

plead guilty. (Doc. #8, pp. 2, 3-4). Stone also asserts that his own affidavit

establishes the necessary facts regarding prejudice. (*Id.*, p. 4). As to his

withholding of evidence claim, Stone urges that the state courts' failure to

address that claim requires a *de novo* review by this Court.

## II.   APPLICABLE LAW

### A.   The Antiterrorism and Effective Death Penalty Act ["AEDPA"][2]

Under the AEDPA, a writ of habeas corpus may not issue with respect to

any claim adjudicated on the merits in state court unless the adjudication

"resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme

Court of the United States." 28 U.S.C. § 2254(d)(1). The phrases "contrary to"

and "unreasonable application" have independent meanings:

> A federal habeas court may issue the writ under the
> 'contrary to' clause if the state court applies a rule

---

[2] Codified in large part in 28 U.S.C. §2254. *See* Pub.L. No. 104-132, 110 Stat. 1214.

> different from the law set forth in ... [Supreme Court]
> cases, or if it decides a case differently that we have
> done on a set of materially indistinguishable facts.  The
> court may grant relief under the 'unreasonable
> application' clause if the state court correctly identifies
> the governing legal principle from ... [the Supreme
> Court's] decisions but unreasonably applies it to the
> facts of a particular case.  The focus on the latter inquiry
> is whether the state court's application of clearly
> established federal law is objectively unreasonable ...
> and an unreasonable application is different from an
> incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002) (citation omitted); *see Broom v. Mitchell*, 441 F.3d 392, 398 (6th Cir. 2006) (quoting in part *Bell*, 535 U.S. at 694), *cert. denied*, 549 U.S. 1255 (2007).

"A decision is an 'unreasonable application' of clearly established Supreme Court law if a 'state court correctly identifies the governing legal principle from [Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case.'"  *Gray v. Moore*, 520 F.3d 616, 621 (6th Cir.) (quoting in part *Williams*, 529 U.S. at 413), *cert. denied*, ___ U.S. ___, 129 S. Ct. 216 (2008).  "An unreasonable application of federal law is one that is 'objectively unreasonable' and not merely incorrect."  *Sinkfield v. Brigano*, 487 F.3d 1013, 1016 (6th Cir.) (citations omitted), *cert. denied*, ___ U.S. ___, 128 S. Ct. 401 (2007).

On the other hand, by its very terms, the AEDPA applies only to claims that were "adjudicated on the merits" in state court.  28 U.S.C. § 2254(d); *see*

*Danner v. Motley*, 448 F.3d 372, 376 (6th Cir.2006). Where the state courts did not rule on the merits of a claim, the federal courts review such claims *de novo*. *See Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir.2003) ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply. Instead, this court reviews questions of law and mixed questions of law and fact *de novo*.").

For purposes of habeas review, a state court's determinations of factual issues are presumed correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). That deference extends to the state court's credibility assessments, *see Seymour v. Walker*, 224 F.3d 542, 553 (6th Cir. 2000), *cert. denied*, 532 U.S. 981 (2001), and to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997). "Indeed, the presumption applies with particular force to credibility determinations, as the Supreme Court has ruled that such determinations receive 'special deference' from the federal courts." *Id.* (citing *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)). The same presumption also applies to state appellate courts' findings of fact

made on review of the state trial record.  *Sumner v. Mata*, 449 U.S. 539 (1981);

*Mason v. Mitchell*, 320 F.3d 604, 614 (6th Cir. 2003).

**B.**     <u>**Ineffective Assistance of Trial Counsel**</u>

The Sixth Amendment, applicable to the states through the Fourteenth

Amendment, provides a criminal defendant with "the right to the effective

assistance of counsel."  *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052

(1984)(quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).  To establish

a claim of ineffective assistance of trial counsel, a criminal defendant must make

a two-part showing:

> First, the defendant must show that counsel's
> performance was deficient.  This requires showing that
> counsel made errors so serious that counsel was not
> functioning as the 'counsel' guaranteed the defendant
> by the Sixth Amendment.  Second, the defendant must
> show that the deficient performance prejudiced the
> defense.  This requires showing that counsel's errors
> were so serious as to deprive the defendant of a fair
> trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687; *see O'Hara v. Brigano*, 499 F.3d 492, 505 (6th Cir. 2007).

These standards apply in the context of representation provided during

plea hearings, with the second prong focusing on "whether counsel's

constitutionally ineffective performance affected the outcome of the plea process.

In other words, in order to satisfy the 'prejudice' requirement, the defendant

must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *see Dando v. Yukins*, 461 F.3d 791, 798 (6th Cir. 2006).

### C.   <u>Withholding of Evidence by the Prosecution</u>

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Accordingly, the government in criminal cases must turn over to the defense any evidence in its possession that is both favorable to the accused and material to guilt or punishment. *United States v. Benes*, 28 F.3d 555, 560 (6th Cir. 1994), *cert. denied*, 513 U.S. 1117 (1995). "[I]t is well-settled that this disclosure obligation includes evidence that could be used to impeach the credibility of a witness." *Schledwitz v. United States*, 169 F.3d 1003, 1011 (6th Cir. 1999) (citing *Giglio v. United States*, 405 U.S. 150, 154-55 (1972)).

Evidence is "material" pursuant to *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is a probability sufficient to undermine

confidence in the outcome of the trial. *Strickler v. Greene*, 527 U.S. 263, 289-90

(1999). Thus, "[t]o assert a successful *Brady* claim, a habeas petitioner must show

that: (1) evidence favorable to the petitioner, (2) was suppressed by the

government, and (3) the petitioner suffered prejudice." *Johnson v. Bell*, 525 F.3d

466, 475 (6th Cir. 2008) (citing *Banks v. Dretke*, 540 U.S. 668, 691 (2004)), *cert. denied*,

___ U.S. ___, 129 S. Ct. 2427 (2009).

"The *Brady* rule does not assist a defendant who is aware of essential facts

that would allow him to take advantage of the exculpatory evidence at issue."

*Coleman v. Mitchell*, 268 F.3d 417, 438 (6th Cir. 2001) (citing, *inter alia, United States

v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990)), *cert. denied*, 535 U.S. 1031 (2002); *see also

Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000) (there is "no *Brady* violation if the

defendant knew or should have known the essential facts permitting him to take

advantage of the information in question . . ."). The same is true if "the

'withheld' evidence was not exclusively within the possession of the

prosecution," such as "where the evidence . . . is available from another source."

*Bonnell v. Mitchell*, 212 Fed. Appx. 517, 526 (6th Cir.) (quoting *Coe v. Bell*, 171 F.3d

320, 344 (6th Cir. 1998)), *cert. denied*, ___ U.S. ___, 128 S. Ct. 710 (2007). As such, a

defendant's own awareness of other individuals with potentially relevant

information undermines any *Brady* violation claim based on the state's failure to

disclose information about such individuals' possible connection to the case. *See*

*Bonnell*, 212 Fed. Appx. at 523. Non-disclosure of criminal convictions that are

matters of public record ordinarily will not support a *Brady* violation. *See Hicks v.*

*Collins*, 384 F.3d 204, 221 (6th Cir. 2004) (citing *State v. Cook*, 83 Ohio St.3d 404

(1998)), *cert. denied*, 544 U.S. 1037 (2005); see also *Bell v. Bell*, 512 F.3d 223, 235 (6th

Cir.) (*en banc*), *cert. denied*, ___ U.S. ___, 129 S. Ct. 114 (2008).

III.   **ANALYSIS**

Respondent's answer/return of writ in effect concedes that Petitioner's

action here is timely (*see* Doc. #7, pp. 5-6), and raises no default, exhaustion or

other procedural challenges to his allegations of error. (*See* Doc. #7, pp. 6-14; *see*

*also* Doc. #8, p. 1). Accordingly, this Court, too, will proceed directly to the

merits of Stone's claims.

A.     **Petitioner's Ineffective Assistance of Counsel Claim**

Petitioner first asserts that he was denied his constitutional right to the

effective assistance of counsel by his trial counsel's refusal to interview witnesses

or otherwise investigate the circumstances of the crime charged; his failure to

maintain meaningful attorney-client communication; and his misrepresentations

to Petitioner about the supposed lack of funding for a private investigator and a

supposed prosecution threat to add a felony murder charge. (Doc. #1, p. 6; Doc.

#6, pp. 1-4; Doc. #8, pp. 3-4).  Petitioner claims that his attorney's deficiencies in those respects "constituted the sole cause for [Stone's] acquiescence to the entry of a guilty plea."  (Doc. #6, p. 2).

In bringing his ineffective assistance of counsel allegations before the trial court, Petitioner sought to establish both his counsel's deficiencies and the resulting prejudice by offering his own affidavit, averring as follows:

> 2.  That my court[-]appointed attorney failed to investigate potential witnesses[,] stating [that] they w[ ]ere relatives of the decease[d] [and] therefore [that] talking to them would be fruitless.

> 3.  That I informed trial counsel that the incident happen[ed] at a bar and the bar had security cameras that would validate my statement and that there were many witnesses there that were not related to the decease[d].

> 4.  That trial counsel filed a "Motion" for the assistance of a "Private Investigator" . . . [but that through counsel's fault,] a private investigator was never assigned to the case who would have obtained evidence and witnesses that would have clarified what manifested at the bar and outside the bar.

> 5.  That trial counsel "***did not***" speak to any of the witnesses of record who[se] statements w[ ]ere contradictory; however, all stated that they "***did not***" witness what transpired[d] outside the bar, [or] in fact who shot Mr. Evans[.]

> 6.  That I was coerce[d], manipulated and frighten[ed] into entering a guilty plea; therefore, it was not made knowingly, intelligently and voluntarily.

16

7.  That because [of] trial counsel's failure to conduct a thorough investigation his strategy to get me to plea[d] guilty was not based on accurate knowledge of the case; therefore, rendering his assistance ineffective.

8.  That Rebecca A. McDargh was "***uncertain***" as an eye witness because upon viewing the "Photo Array" she picked [another individual first and] then myself . . .[,] clearly demonstrating that she was uncertain about who she saw.

9.  That one eye witness "Karen S. Jenkins" stated that she saw three (3) black males and one being Ang[ela's] [sic] boyfriend (Christopher Tinsley).

10.  That Robert Burchnell stated [that] after hearing shots he went outside and saw a black male wearing cloth[e]s that w[ere] not con[sistent] with what I was wearing leaving the scene (security camera would have verified what I was wearing and who the other person was).

11.  That allege[d] witness Mich[ae]l Lemming's statement is totally contrary to Robert Burchnell['s], but both allege to be eye witnesses.

12.  That several witnesses stated that three (3) black men from Dayton w[ere] there, [but] how would they know where the men were from?  Is there a certain walk or look that distinguish[es] men from Dayton or somewhere else?

13.  That i[t] was never clarified how the bar tender got the people who were fighting out of the bar.

14.  That if trial counsel would have investigated and read all the statements and spoke[n] to the allege[d]

witnesses he would/should have t[aken] affirmative action to retrieve the security tape.

15. That Andrea S. Carter has given an affidavit attesting to [the] trial attorney's leading her, myself and my family to believe [that] retaining a private investigator was not needed because the Court was going to provide one. And that I and my family would need the funds for a [b]allistic[s] specialist.

(Doc. #7, Exh. 4, Affidavit of Jamarr Stone) (emphasis in original) (citations to exhibits omitted).

The handwritten affidavit of Andrea Carter referred to in paragraph 15 of Petitioner's affidavit also is in the record, and states as follows, in its entirety:

My name is Andrea S. Carter, Jamarr Stone Sr.'s fiancee. I've had several conversations with his court appointed lawyer, Paul J. Kavanaugh. Mr. Kavanaugh usually kept me informed on his visits and discussions he had with Jamarr, through phone conversations. He called several times stating Jamarr wanted him to inform me on what's going on with his case and what legal work need[ed] to be done. There w[ere] two specific times I remember Paul Kavanaugh calling me. One saying "Don't fund the private investigators, because we might need the money for a Ballistic specialist." And he also said "if he had to he would go door to door [to] interview those witnesses by himself." The other call Mr. Kavanaugh said that he would call me later on in the week to let me know how much the ballistic specialist would cost. And to actually find out whether Mr. Evans was running toward or away from Jamarr, the Ballistic expert would have to come from out of town and it wouldn't be cheap (due to him traveling).

(Doc. #6, Exh., Affidavit of Andrea S. Carter dated November 8, 2004).

Additionally, Petitioner offers one other affidavit with possible bearing on his ineffective assistance of counsel claim, stating as follows, in pertinent part:

> My name is Eric D. Stone, I am the brother of Jamarr R. Stone, the brother that was present at Boris' Nite Club the night of Feb. 25th, 2004, when he was beaten up by William Evans. Camille Burton and I were sitting outside of the club in her car when everything happened. Camille and I were about to join Jamarr inside of the bar when Jamarr came running out of the club saying "Help me!" while pounding frantically on the passenger window. I admit, I did consume several alcoholic beverage[ ]s, and I do not remember the full incident that occur[r]ed that night, however I can say that on the above stated date that when my brother was beaten up, I had never seen him in so much pain, nor that scared within the 24 yrs. that I've know him. That night my brother was suffering a lot of pain in the left side of his body, and he kept saying that he needed to go to the hospital but he was entirely too scared. Jamarr could[n't] hardly move in either direction, nor could he walk straight, the result of William Evans attacking him inside of the club before Camille and I were able to make it inside of the club . . .

(Doc. #6, Exh., Affidavit of Eric D. Stone).

Habeas petitioners such as Stone who pled guilty to the charge underlying their sentence face a significant hurdle in seeking to overcome the presumptive waiver of rights occasioned by their plea. To succeed in establishing a violation of his right to effective assistance of counsel, not only must Petitioner here

demonstrate that his attorney made errors so serious as to fail to provide the 'counsel' guaranteed by the Sixth Amendment, *see Strickland*, 466 U.S. at 687, but he also must show that but for his attorney's errors, he likely would have insisted on going to trial rather than entering a guilty plea. *See Hill*, 474 U.S. at 58.

Beginning the analysis with the "prejudice" prong of that burden, the Court first notes that Petitioner terms his "own affidavit . . . the primary evidence of his intentions" as to whether he would have "insisted on a trial" absent trial counsel's alleged errors. (*See* Doc. #8, p. 4). With respect to his affidavit's assertion that Petitioner "was coerce[d], manipulated and frighten[ed] into entering a guilty plea" (Doc. #7, Exh. 4, Affidavit of Jamarr Stone, ¶6), however, the state trial judge specifically found "that the affidavits accompanying [Stone's] petition lack credibility," and that "Stone plead guilty o[f] his own volition." (Doc. #7, Exh. 7, p. 7). Under applicable law, the state court's factual findings to that effect are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1); *see also Patton*, 467 U.S. at 1038; *Seymour*, 224 F.3d at 553; *McQueen*, 99 F.3d at 1310.

Petitioner nonetheless maintains that the presumption of correctness "is rebutted" in this case by the record, "[o]ther than the recitation from the colloquy." (Doc. #8, p. 4). This Court disagrees. The trial court based its post-conviction findings on the fact that the same judge considering Stone's petition

also "preside[d] as trial judge and observed [Stone] and his attorney;" on Stone's reliance on self-serving affidavits "of the petitioner and relatives or friends;" and on the court's perception that "each of Stone's assertions ha[s] the effect of recanting prior statements or [is] otherwise controverted by the record." (Doc. #7, Exh. 7, p. 5). The trial court was better positioned than this and other reviewing courts to make the underlying credibility assessments leading to those findings.

Most significantly, the trial court quoted that portion of the plea hearing transcript where Stone affirmed that he had "discussed this case and [his] possible defenses with [his] attorney" and was "satisfied with the advice and representation" that his attorney had given him; and denied that anyone "made any threat . . . to get [him] to enter this plea." (*Id.*, pp. 5-6, quoting Doc. #9, pp. 6-7). His *ex post facto* attempt to disavow the import of that exchange with the trial court notwithstanding, Stone's own guilty plea colloquy undermines his affidavit's assertion that he "was coerce[d], manipulated and frighten[ed] into entering a guilty plea." (*See* Doc. #7, Exh. 4, Affidavit of Jamarr Stone, ¶6). Because the record contains ample evidentiary support for the state trial judge's findings, this Court is constrained to defer to those findings. *See Norris v.*

*Schotten*, 146 F.3d 314, 324 (6th Cir.) (citing *Clemmons v. Sowders*, 34 F.3d 352, 354 (6th Cir. 1994)), *cert. denied*, 525 U.S. 935 (1998).

Moreover, irrespective of the trial court's findings as to Stone's credibility and the voluntariness of his plea, an independent review of the evidence does not convince this Court that Petitioner was prejudiced by the conduct he attributes to his trial counsel. "[W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." *Hill*, 474 U.S. at 59. "Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Id.*; *see also Dando*, 461 F.3d at 798 ("In the case of an unexplored affirmative defense or undiscovered evidence, th[e] prediction of the likely outcome at trial is relevant to determine whether or not the potential defense or evidence would have caused counsel to change the recommendation as to the plea").

Here, trial counsel cannot be accused of failing to advise Petitioner of a possible affirmative defense, as Stone acknowledges that he personally was aware of, and directed his attorney toward evidence that might support, a potential self-defense claim.[3]  (*See* Doc. #7, Exh. 4, Affidavit of Jamarr Stone).  The evidence presented by Petitioner himself also demonstrates that despite any alleged failure to investigate, defense counsel was aware of potential witnesses and of the possible existence of video footage that might depict Stone's and Evans' respective actions outside the bar where the shooting occurred (*see* Doc. #7, Exh. 4, Affidavit of Jamarr Stone, ¶3); that counsel pursued acquiring funding for a private investigator to interview witnesses and otherwise investigate the incident (*id.*, ¶4; *see also* Doc. #7, Exh. 16, p. 2 [state court docket entry of motion for investigator]; Doc. #6, Exh., Motion ["for an order permitting counsel to retain the services of an investigator"]); that counsel considered retaining a ballistics expert to address forensic evidence suggesting that Evans had been shot through the back of the head (Doc. #7, Exh. 4, Affidavit of Jamarr Stone, ¶15; *see also* Doc. #6, Exh., Affidavit of Andrea S. Carter); and that counsel "had several

---

[3]The Court is cognizant that Petitioner urges not only the potential viability of a self-defense claim, but also that a more thorough investigation might have yielded evidence that would have supported a lesser charge of manslaughter.  (*See, e.g.,* Doc. #6, p. 3) ("Petitioner's actions constitute, at worst, manslaughter and, at best self-defense . . . .").  Despite that recognition, the Court for the sake of efficiency will refer specifically only to the self-defense claim throughout this discussion, intending that its analysis on that point also encompass "the lesser charge of manslaughter" argument.

conversations" with Petitioner's fiancee, "usually kept [her] informed on his visits and discussion" with Petitioner, "called several times" with updates, including "two specific times [she] remember[s]," and pledged to "go door to door interviewing those witnesses by himself" if necessary. (Doc. #6, Exh., Affidavit of Andrea S. Carter).

Stone's fiancee's affidavit undercuts Petitioner's allegation that trial counsel "failed to maintain any meaningful attorney-client communication," (Doc. #1, p. 6), describing a seemingly more industrious attorney than that depicted by Petitioner. Beyond that, however, the evidence viewed as a whole illustrates that despite knowledge of an altercation between Stone and Evans that might be used to depict the victim as the aggressor, trial counsel still advised Petitioner to accept a plea of guilty to one count of murder, in exchange for dismissal of the firearm specification and the tampering with evidence count. (Doc. #7, Exh. 2; Doc. #9, pp. 3, 11-12). Nothing in the record convinces this Court that possession of the bar surveillance video, the results of witness interviews, or a ballistic specialist's report would have motivated Petitioner's trial attorney to reconsider that advice in favor of advancing a self-defense claim.

Petitioner, who admits to being the shooter (*see* Doc. #9, p. 16), was confronted with the daunting prospect of a trial in which eye witness testimony

and forensic evidence would have suggested that after a fight with Evans, Stone shot that highly-intoxicated man through the head while Evans was turned away from him.  The allusion to a ballistics expert reflects trial counsel's realistic recognition that some reasonable explanation for the fatal bullet's trajectory would be critical if Stone were to have any hope of avoiding conviction; the notion that an expert could explain away a bullet to the back of the victim's head, or that a jury would accept any such explanation, is speculative at best.

For the same reason, the record gives this Court no basis to infer that Petitioner was prejudiced by any of the other alleged shortcomings in his counsel's performance.  It would not be unreasonable for trial counsel to conclude that information conducive to impeaching witnesses based on their past criminal records, bias stemming from their relationship with the deceased, or minor discrepancies in their accounts of the incident would not be enough to overcome evidence that Petitioner had shot Evans in the back of the head.  Likewise, the affidavit of the one pro-Petitioner eye witness Stone offers concedes that such witness "did consume several alcoholic beverage[ ]s, and I do not remember the full incident that occur[r]ed that night."  (Doc. #6, Exh., Affidavit of Eric D. Stone).  Not only does that admission render that purported witness's testimony of dubious value with regard to any claim of self-defense, but because

the affiant is Petitioner's brother, the witness also is vulnerable to the same suspicion of bias that Petitioner suggests afflicted many prosecution witnesses.

"[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-91. Based on the record, this Court determines that Petitioner's trial counsel made a reasonable professional decision to advise Petitioner to accept a negotiated plea agreement rather than risk the possibility of being convicted of all the charges against him.[4] That reasonable decision rendered unnecessary the further "particular investigations" that form the basis for Petitioner's ineffective assistance of counsel claim.

Especially in light of trial counsel's representation at the plea hearing that Petitioner himself initiated the plea discussions "and asked [that] there not be a trial in this case" (Doc. #9, p. 15), to which statement Petitioner silently

---

[4]As to Petitioner's contention that his attorney "falsely asserted to Petitioner that the prosecution had stated that if Petitioner did not 'take the deal' he would be charged with additional counts and sentenced to 38 years to life" (Doc. #6, p. 2), the Court observes that Petitioner has not proven that the prosecutor did <u>not</u> allude to the possibility of additional charges, or that the facts would not have supported additional charges. Again, Petitioner's colloquy denial of "any threat" (Doc. #9, p. 7) also belies this contention.

acquiesced (*see id.*), this Court finds that Petitioner has not established the prejudice necessary to warrant habeas relief for ineffective assistance of counsel. His petition seeking a writ on that basis must be denied.

### B.     Petitioner's *Brady* Claim

As his second ground for relief, Petitioner Stone contends that he was denied his constitutional right to due process of law by the prosecution's withholding of exculpatory evidence.  (*See* Doc. #1, pp. 7-8; Doc. #6, pp. 4-7).  As Petitioner aptly notes, the state court "failed to address th[is] *Brady v. Maryland* claim[ ] at all."  (Doc. #8, p. 1; *see* Doc. #7, Exhs. 7, 12, 15).  Accordingly, that claim warrants *de novo* review.  *See Maples*, 340 F.3d at 436.

In support of his *Brady* claim, Petitioner asserts that the prosecution failed to produce to defense counsel a video surveillance tape from the location of the subject shooting; the criminal histories of several prosecution witnesses; Evans' criminal history and post-mortem toxicology report; and the police reports relative to the shooting investigation.  (*See* Doc. #1, pp. 7-8; Doc. #6, pp. 4-7). Petitioner argues that each of these items was exculpatory in nature, in that witnesses' criminal histories could have been used to impeach the credibility of those testifying against Petitioner, and all other items would have reinforced Stone's self-defense claim, *i.e.*, that the surveillance video would have shown

Evans to have been the aggressor; Evans' criminal past and level of intoxication would have substantiated Petitioner's fear of a violent assault; and the police reports would have confirmed that the victim held a shiny cell phone that Petitioner could have mistaken for a gun.  (*Id.*).

To succeed on such a claim, Petitioner must show that this evidence would have been favorable to his defense, that the State suppressed it, and that he was prejudiced thereby.  *See Johnson*, 525 F.3d at 475.

In this case, there is no indication that the prosecution exercised exclusive control over much of the allegedly 'withheld' evidence, as is necessary to implicate *Brady* concerns.  *See Bonnell*, 212 Fed. Appx. at 523, 526 .  "Where . . . 'the factual basis' for a claim is 'reasonably available to' the petitioner or his counsel from another source, the government is under no duty to supply that information to the defense."  *See Matthews v. Ishee*, 486 F.3d 883, 891 (6th Cir.) (citation omitted), *cert. denied*, ___ U.S. ___, 128 S. Ct. 613 (2007); *see also Coe,* 161 F.3d at 344 (There is no *Brady* violation where information is available to the defense "because in such cases there is really nothing for the government to disclose.").  The criminal convictions of the shooting victim and of testifying witnesses are matters of public record that ordinarily will not support a *Brady* violation.  *See Hicks*, 384 F.3d at 221; *see also Bell*, 512 F.3d at 231 (distinguishing

*Banks*, 540 U.S. 668).  Moreover, the Constitution does <u>not</u> require pre-guilty plea disclosure of impeachment information.  *United States v. Ruiz*, 536 U.S. 622, 629-30 (2002) ("It is particularly difficult to characterize impeachment information as critical information of which the defendant must always be aware prior to pleading guilty given the random way in which such information may, or may not, help a particular defendant. The degree of help that impeachment information can provide will depend upon the defendant's own independent knowledge of the prosecution's potential case – a matter that the Constitution does not require prosecutors to disclose."); *see also United States v. Wells*, 260 Fed. Appx. 902 (6th Cir. 2008) ("[T]he Government has no duty to disclose [impeachment] information prior to a defendant's entry of a guilty plea.").  For all of these reasons, the prosecutor's failure to disclose the witnesses' and victim's criminal records does not warrant habeas relief.

The record before the Court does not definitively demonstrate that the prosecution had in its possession all remaining items that form the basis for Petitioner's withheld evidence claim (*e.g.*. the bar's surveillance video). Assuming *arguendo* that the prosecution <u>did</u> exercise control over all remaining items Petitioner enumerates, that a proper request was made on Stone's behalf for such evidence (*see* Doc. #7, Exh. 16, p. 1 ["Defendents [sic] Demand for

29

Discovery"]), and that the prosecution failed to produce such items, however, a *de novo* review of the purportedly withheld evidence nonetheless does not bear out Petitioner's position.

Evidence that the shooting victim was legally intoxicated (*see* Doc. #6, Exh., "Montgomery County Coroner's Office," "Toxicology Laboratory Report") is not necessarily "exculpatory," in that it would seem to be at least as indicative that Petitioner should have been able to evade Evans in his drunken state as it would be indicative that Evans may have been acting aggressively. As to the surveillance video, even if it were shown to depict Evans exhibiting aggressive behavior toward Stone at some time prior to the shooting, such evidence would not compel a reasonable jury to conclude that a later shooting through the back of Evans' head was justified as self-defense.

Although the last piece of evidence cited by Petitioner – a mention in one summary signed by Sandra L. Fent that the shooting victim was found with "a silver cell phone" in his right hand (*see* Doc. #6, Exh., "Inter-Office Communication") – could have lent credence to Stone's contention that he believed that Evans had a gun, even such evidence is not enough to show that Stone was prejudiced by accepting a guilty plea rather than facing trial for all charges. "When a criminal defendant has solemnly admitted in open court that

he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Campbell v. Marshall*, 769 F.2d 314, 318 (6th Cir. 1985), *cert. denied*, 475 U.S. 1048 (1986). In *Campbell*, the federal appellate court declined to grant habeas relief to an Ohio petitioner who learned only after pleading guilty to two counts of aggravated murder that police had found a semi-automatic pistol on the shooting victim's body. *See id.* at 316. Although the petitioner there "contended that he pleaded guilty only because he had no believable self-defense claim and that he would have gone to a jury with that defense had he known of the gun," *id.* at 317, the Sixth Circuit noted "that there is no authority within our knowledge holding that suppression of *Brady* material prior to trial amounts to a deprivation of due process." *Id.* at 322 (emphasis in original). Because "it is unclear what prejudicial effect this non-disclosure would have had at a trial; that is, even if this evidence had been disclosed and introduced at a trial, the weight a jury would have given it . . .," *id.* at 322, the Court in *Campbell* "c[ould ]not say" whether disclosure of the existence of the victim's gun "would have been controlling in the decision whether to plead" guilty, *id.* at 324, and held that the non-disclosure thus did not violate the petitioner's due process rights.

In light of that holding as to non-disclosure where the shooting victim actually possessed a <u>gun</u>, we cannot conclude that Stone was prejudiced in making his plea decision by the non-disclosure that Evans was carrying a <u>cell phone</u>.  Absent such a showing of prejudice, Petitioner cannot prevail on his request for relief based on the prosecution's alleged withholding of evidence.

The conclusions reached herein are not debatable by jurists of reason and do not otherwise present issues adequate to deserve encouragement to proceed further.  Consequently, a certificate of appealability should not issue.


**IT THEREFORE IS RECOMMENDED** that:

1)  Petitioner's Petition for Writ of Habeas Corpus (Doc. #1) be DENIED and DISMISSED with prejudice; and

2)  A certificate of appealability under 28 U.S.C. §2253(c) not issue; and

3) this matter be TERMINATED on the docket of this Court.


August 25, 2009                    <u>  s/Sharon L. Ovington      </u>
                                             Sharon L. Ovington
                                   United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten [10] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen [13] days (excluding intervening Saturdays, Sundays and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten [10] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Am*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981).